No. 24-760

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

SECOND AMENDMENT FOUNDATION, ET AL.
*Plaintiffs/Appellants,*

v.

FERGUSON, ET AL.,
*Defendants/Appellees.*

---

On Appeal from the United States District Court
for the Western District of Washington
No. 2:23-cv-01554-MJP
Hon. Marsha J. Pechman, District Judge

---

## APPELLANTS' OPENING BRIEF

---

CORR CRONIN LLP

Steven W. Fogg, WSBA No. 23528
Jack M. Lovejoy, WSBA No. 36962
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
(206) 625-8600 Phone
(206) 625-0900 Fax
sfogg@corrcronin.com
jlovejoy@corrcronin.com

*Attorneys for Plaintiffs/Appellants*

## DISCLOSURE STATEMENT

No publicly held corporation owns 10% or more of the stock of any Appellant

who is a corporation, nor do any have a parent corporation.

## TABLE OF CONTENTS

DISCLOSURE STATEMENT .................................................................. i

TABLE OF CONTENTS.................................................................... ii

TABLE OF AUTHORITIES ............................................................ iv

I. INTRODUCTION .......................................................................1

II. JURISDICTIONAL STATEMENT....................................................8

III. CONSTITUTIONAL AND STATUTORY AUTHORITIES...........................9

IV. ISSUES PRESENTED ................................................................9

V. STATEMENT OF THE CASE.......................................................10

    A.    Factual Background...........................................................10

        1.    Washington Attorney General Bob Ferguson Uses His Powers of Office against his Ideological Enemies to Advance his Political Career.....................................10

        2.    State Defendants Unconstitutionally Target Mr. Gottlieb and SAF in Retaliation for their Protected Advocacy and Political Beliefs ........................................14

        3.    Public Records Requests and State Defendants' Own Conduct Reveal the Investigation's Retaliatory Purpose ........17

    B.    Procedural History.............................................................22

        1.    State Defendants Attempt to Play Hot Potato with the Case, Bouncing it from Federal Court to State Court to Federal Court to State Court .................................22

        2.    The District Court Dismisses the Case in Violation of Clear Precedent ........................................................27

VI. SUMMARY OF THE ARGUMENT ................................................32

VII. STANDARD OF REVIEW..........................................................36

VIII. ARGUMENT ...........................................................................36

    A.     Mr. Gottlieb and SAF's Claims are Constitutionally Ripe .................36

    B.     Even if Mr. Gottlieb and SAF had not Provided Sufficient Allegations Regarding their Constitutionally Cognizable Injuries, the District Court would have still Abused its Discretion by Denying Leave to Amend.............................43

    C.     If the District Court Lacked Jurisdiction and Properly Denied Leave to Amend, Dismissal *still* was not Permitted, and SAF and Mr. Gottlieb were Entitled to their Costs and Attorneys' Fees.............................................................46

    D.     The District Court's Alternative Ruling Regarding Prudential Ripeness was Erroneous for Multiple Reasons...................................49

        1.     Federal Courts are Not Allowed to Provide Advisory Rulings on Other Issues after Concluding They Lack Jurisdiction ................................................50

        2.     State Defendants Waived Prudential Ripeness by Removing the Case ................................................52

        3.     Mr. Gottlieb and SAF's Claims are Prudentially Ripe.............55

IX. CONCLUSION.....................................................................58

CERTIFICATE OF SERVICE ..............................................61

# TABLE OF AUTHORITIES

## CASES

*A Forever Recovery, Inc. v. Twp. of Pennfield*,
  606 Fed. App'x. 279 (6th Cir. 2015) ...................................................... 26, 48, 49

*Alaska Right to Life PAC v. Feldman*, 504 F.3d 840 (9th Cir. 2007) ......................56

*Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) ...........................42

*Arizona Students' Ass'n v. Arizona Bd. of Regents*,
  824 F.3d 858 (9th Cir. 2016) ................................................................56

*Bruns v. Nat'l Credit Union Admin.*, 122 F.3d 1251 (9th Cir. 1997) ......................46

*Caterpillar Inc. v. Williams*, 482 U.S. 386 (1987) ..................................................47

*City of Oakland v. Lynch*, 798 F.3d 1159 (9th Cir. 2015) .......................................52

*Duncan v. Stuetzle*, 76 F.3d 1480 (9th Cir. 1996) ...................................................47

*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003) .................44

*Ex parte McCardle*, 7 Wall. 506, 19 L.Ed. 264 (1868) ..........................................50

*Fair Hous. of Marin v. Combs*, 285 F.3d 899 (9th Cir. 2002) .................................38

*Foman v. Davis*, 371 U.S. 178 (1962) ....................................................................44

*Hacienda Valley Mobile Estates v. City of Morgan Hill*,
  353 F.3d 651 (9th Cir. 2003) ................................................................36

*Heck v. Humphrey*, 512 U.S. 477 (1994) ................................................................57

*Hitt v. City of Pasadena*, 561 F.2d 606 (5th Cir. 1977) ..........................................51

*In re Coleman*, 560 F.3d 1000 (9th Cir. 2009) .......................................................50

*Knick v. Twp. Of Scott, Pennsylvania*, 588 U.S. 180 (2019) ............................ 33, 40

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
  624 F.3d 1083 (9th Cir. 2010) ..............................................................39

*Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613 (2002) ..............52

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ........51

*Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000) .......................................................36

*LSO, Ltd. v. Stroh*, 205 F.3d 1146 (9th Cir. 2000) ..................................................36

*Martin v. Franklin Capital Corp.*, 546 U.S. 132 (2005) .........................................47

iv

*Media Matters for Am. v. Paxton,*
  No. 24-CV-147, 2024 WL 1773197 (D.D.C. Apr. 12, 2024) ............................45

*Middlesex County Ethics Comm. v. Garden State Bar Ass'n,*
  457 U.S. 423 (1982) ..............................................................................................23

*Moore v. Permanente Med. Grp., Inc.*, 981 F.2d 443 (9th Cir. 1992)....................36

*N. Mill St., LLC v. City of Aspen*, 6 F.4th 1216 (10th Cir. 2021) ...........................51

*Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015)..................44

*Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998)......................................55

*Patel v. City of S. El Monte*, 827 Fed. App'x. 669 (9th Cir. 2020) ........................52

*Polich v. Burlington N., Inc.*, 942 F.2d 1467 (9th Cir.1991)........................... 44, 45

*Polo v. Innoventions Int'l, LLC*, 833 F.3d 1193 (9th Cir. 2016) ................. 6, 26, 46

*Principal Life Ins. Co. v. Robinson*, 394 F.3d 665 (9th Cir. 2005) ........................47

*Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226 (E.D.N.Y. 2009) ....................41

*Righthaven LLC v. Hoehn*, 716 F.3d 1166 (9th Cir. 2013) ....................................51

*River N. Properties, LLC v. City & Cnty. of Denver,*
  No. 13-CV-01410-CMA-CBS, 2014 WL 1247813 (D. Colo. Mar. 26, 2014)....52

*Sansotta v. Town of Nags Head*, 724 F.3d 533 (4th Cir. 2013)................. 52, 53, 55

*Sauk-Suiattle Indian Tribe v. City of Seattle*, 56 F.4th 1179 (9th Cir. 2022) ..........36

*Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50 (9th Cir. 2024)................................39

*Socialist Labor Party v. Gilligan*, 406 U.S. 583 (1972)........................................50

*Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310 (9th Cir. 1989)........................42

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ........................... 50, 51

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)......................................50

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ............................................41

*Twitter, Inc. v. Paxton*, 56 F.4th 1170 (9th Cir. 2022) ................................... passim

*Value Village*, No. 17-2-32886 (King. Cnty. Sup. Ct.) ................................... passim

*Wallace v. Kato*, 549 U.S. 384 (2007) ...................................................................58

*Warth v. Seldin*, 422 U.S. 490 (1975)............................................................. 10, 43

*Washington v. Brelvis Consulting LLC*, 436 P.3d 818 (2019) ...............................40

v

*Washington v. TVI, Inc.* ("*Value Village*"), 524 P.3d 622 (Wash. 2023) ...............12

*Westland Irrigation Dist.*,
   No. 2:16-CV-1318-SI, 2017 WL 1055960 (D. Or. Mar. 20, 2017) ....................52

*White v. Lee*, 227 F.3d 1214 (9th Cir. 2000) ............................................... 28, 41, 58

*Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*,
   473 U.S. 172 (1985) ....................................................................................53

*Wolfson v. Brammer*, 616 F.3d 1045 (9th Cir. 2010) ........................................36

*Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*,
   433 F.3d 1199 (9th Cir. 2006) ....................................................................55

## STATUTES

28 U.S.C. § 1291 ..................................................................................................9

28 U.S.C. § 1331 ..................................................................................................8

28 U.S.C. § 1343 ..................................................................................................8

28 U.S.C. § 1367(a) ..............................................................................................8

28 U.S.C. § 1447(c) .................................................................................. 6, 46, 47

42 U.S.C. § 1983 ........................................................................................ 54, 57

RCW 19.86.110.....................................................................................................22

## RULES

Fed. R. Civ. P. 11(b) ...........................................................................................48

Fed. R. Civ. P. 12(b)(1).......................................................................................51

Fed. R. Civ. P. 12(b)(6).......................................................................................51

Fed. R. Civ. P. 15(a)(2).......................................................................................44

## TREATISES

Wright & Miller, 5B Fed. Prac. & Proc. Civ. (4th ed.) .........................................51

# I.  INTRODUCTION

Without the First Amendment, our democratic system is a façade.  An electorate cannot vote for candidates or policies if it never hears of them, and an election is not really an election when the incumbent government has run all its opposition out of town.  The Framers knew this, so they drafted a Constitution that forbids government officials from silencing or punishing their political enemies.  But Washington Attorney General Bob Ferguson acts as if he has found a loophole.

Washington law entrusts Mr. Ferguson with an array of investigatory powers, including the right to issue administrative subpoenas to investigate possible violations of consumer protection laws.  Regardless of whether one complies with or challenges these civil investigative demands ("CIDs"), it is expensive and time consuming to respond to them.  Moreover, due to a quirk of Washington legal procedure, it is virtually impossible for Mr. Ferguson's political enemies to raise an effective First Amendment retaliation defense to compliance through normal state-law channels.

Under state law, CIDs are presumed to be valid, and a recipient has only twenty days to petition a court to alter or set aside the CID, during which time the recipient will almost never have the information and evidence needed to rebut the presumption of validity.  After all, Mr. Ferguson's office ("the AGO") is unlikely to

1

include a letter with the CID explaining that it is motivated by unconstitutional political animus rather than any reasonable suspicion of unlawful activity. The AGO has long claimed that a CID recipient who fails to contest a CID during this period waives all right to oppose it and must pay attorney fees if the AGO then petitions a court to summarily enforce the CID.[1]  So, provided Mr. Ferguson and the AGO can hide their unconstitutional motivations for at least three weeks, they can ostensibly get away with using baseless CIDs to target their political opponents scot-free.

If the AGO follows up these groundless CIDs by actually *prosecuting* Mr. Ferguson's political enemies, it can be subject to sanctions for violating the First Amendment (as Mr. Ferguson learned the hard way when the AGO was recently ordered to pay over $4 million in attorney fees for doing just that).  But so long as the AGO merely continues its suspicionless "investigation" indefinitely, it can chill and even halt constitutionally protected activities with apparent impunity, using the

---

[1] For the first time during this litigation, the AGO disclaimed this interpretation of state law because it became advantageous for it to argue an effective alternative state law procedure exists for raising First Amendment retaliation objections to CIDs. 1-ER-74-75 ("While there is an initial 20-day window in which to challenge a CID, that does [not] mean that any future objections are foreclosed.").  But even months after this suit was originally filed, the AGO was still privately telling CID recipients the opposite when threatening them for noncompliance. 1-ER-25 ("[T]he time has expired for you to contest this CID in Court.  Pursuant to the Washington Civil Rules, any objections to the CID are similarly waived. . . . [W]e will seek recovery for our attorney's fees and costs[.]").

effectively unchallengeable CIDs to drain the resources and destroy the reputations of Mr. Ferguson's enemies until they can no longer oppose him. (If it is lucky, the AGO might even turn up some politically useful dirt on Mr. Ferguson's political opponents in the process). If the investigation never ends, neither does the harassment, and according to the AGO, there is nothing the target can do about it.

The AGO leveled these tactics at Mr. Alan Gottlieb, an activist who has long been a thorn in Mr. Ferguson's side due to his advocacy work concerning gun rights and other political stances that Mr. Ferguson opposes. The agency has no basis for believing Mr. Gottlieb or the nonprofit political advocacy groups and other entities he is associated with (here referred to collectively as "SAF"[2]) have broken any laws. But the AGO's Consumer Protection Division ("CPD") nevertheless sent CIDs to an unknown number of SAF's vendors, falsely telling everyone from SAF's webhost to its electric company that SAF was suspected of illegal activity. The CIDs informed the third-parties that, as a consequence of their working with a supposedly criminal organization, they must expend substantial resources providing detailed information about their dealings with SAF to law enforcement or face legal

---

[2] For simplicity, this brief's references to SAF (short for "Second Amendment Foundation") and/or Mr. Gottlieb include all Appellants unless the text or context indicates otherwise.

penalties. And the CIDs prohibited the recipients from disclosing the demands to SAF or the public. At least one firm with whom SAF had contracted abruptly cut contact with SAF as result of the CIDs, disrupting SAF's daily operations.

CPD then served numerous CIDs directly on SAF, Mr. Gottlieb, and his family, claiming they were suspected of somehow violating the same consumer protection laws Mr. Ferguson was recently sanctioned for unconstitutionally abusing (among others). The CIDs demanded they produce tens of thousands of pages of private documents and provide detailed sworn responses to dozens of interrogatories. And they insisted Mr. Gottlieb and his wife and son submit to many hours of intense interrogation in multiple lengthy depositions.

Believing there was a misunderstanding and having neither anything to hide nor clear grounds for challenging the CIDs, Mr. Gottlieb and SAF initially complied with the investigation, eventually spending over $100,000 and hundreds of man hours responding to the CIDs and conducting damage control to repair their reputation with their vendors. But CPD's unconstitutional agenda was revealed over the following years as its inquiry meandered wildly from one easily disproven legal theory to another, each transparent pretext different and unrelated to the ones before. Public records requests revealed—and CPD all but confirms—that CPD received zero consumer complaints suggesting SAF had violated the laws cited in the CIDs

(and, indeed, nearly no consumer complaints regarding the organization at all). And after *two years* of intrusive harassment, the agency still refused to provide any clear explanation of what unlawful conduct Mr. Gottlieb and SAF were suspected of or how they could bring their operations into compliance with the law to avoid further illegal activity or injury to the public. Eventually it became clear that CPD's investigation *never* had any basis other than sheer unconstitutional political animus.

By the time Mr. Gottlieb and SAF realized CPD's investigation was a sham, the twenty-day state-law window for challenging their CIDs had long since passed (and no state-law method of challenging the third-party CIDs ever existed in the first place). Lacking any other recourse, Mr. Gottlieb and SAF filed a § 1983 suit in federal court seeking damages and an order enjoining Mr. Ferguson, the AGO, and the CPD attorney heading the investigation (collectively, "State Defendants") from continuing to unconstitutionally harass them without any suspicion of unlawful activity.

State Defendants vociferously protested that SAF's claims did not belong in *federal* court. They filed a motion to dismiss that argued federal courts are not permitted to review state law enforcement investigations and insisted the district court must abstain from hearing the case out of respect for state sovereignty. Although precedent was clear that state sovereignty did not shield State Defendants

from facing accountability in federal court, Mr. Gottlieb and SAF decided not to waste even more time and resources fighting a collateral procedural battle over which court system should hear their claims. They voluntarily dismissed the case and refiled it in state court where State Defendants had insisted it belonged.

But State Defendants still were not happy. They evidently had a change of heart and immediately filed a notice of removal, transferring the matter right back to the exact same federal court they *had just argued* had no business hearing the case.

This about-face, too, was short-lived. Although State Defendants' removal was predicated on there being federal jurisdiction over SAF's claims, they promptly filed another motion to dismiss arguing that, actually, there *was no* federal jurisdiction over the case. They claimed that, because a state court had not yet rubber-stamped the CIDs for enforcement, Mr. Gottlieb and SAF had yet to suffer the kind of ripe, concrete injury from State Defendants' unconstitutional conduct that is required for federal standing. State Defendants fully admitted their motion effectively sought to transfer the case *yet again* right back to the state court they had removed it from. *See* 28 U.S.C. § 1447(c); *Polo v. Innoventions Int'l, LLC*, 833 F.3d 1193, 1196 (9th Cir. 2016) (holding the exclusive remedy for a lack of standing following removal is remand back to state court).

6

In response, Mr. Gottlieb and SAF pointed out the absurdity of State Defendants' position. Mr. Gottlieb and SAF *had* alleged the kind of concrete, fully consummated injuries that this Court's precedents confirm are sufficient to confer standing even when a CID is not self-executing, and they requested leave to amend their Complaint to further elaborate on their injuries if the court disagreed. But more fundamentally, the necessary implication of State Defendants' incorrect arguments was that State Defendants had filed a removal notice *they themselves* believed was a frivolous waste of time and resources. This type of maneuver—intentionally draining the time and resources of the AGO's political enemies through circuitous, pointlessly protracted investigations and legal proceedings that lack any legitimate underlying bases—was precisely what Mr. Gottlieb and SAF were suing State Defendants for doing! Mr. Gottlieb and SAF thus requested that, if the district court concluded it lacked jurisdiction and remanded the case, they be granted the costs and attorney fees they incurred as a consequence of State Defendants' removal.

The district court neither denied the motion nor remanded. Although this Court's precedents are clear that injuries from non-self-executing CIDs can confer federal standing, the district court held that Mr. Gottlieb and SAF's claims were neither constitutionally nor prudentially ripe. The court discounted each of their present day, fully consummated injuries in an order that raised significant doubts

7

about what a plaintiff could ever possibly allege that would qualify. And—despite State Defendants *conceding* that a case removed from state court can never be dismissed for lack of federal subject matter jurisdiction, only remanded—the district court simply dismissed the case outright, not bothering to address Mr. Gottlieb and SAF's requests for leave to amend or for costs and attorneys' fees.

The district court's order is flatly incorrect. If allowed to stand, it will sanction not only the type of governmental abuse of power that is repugnant to the Constitution, but also the type of bad faith litigation that subverts the justice system by turning the courts themselves into a tool for unconstitutional ends. Reversal is required.

## II. JURISDICTIONAL STATEMENT

As State Defendants effectively conceded by removing this case, 1-ER-213, the district court had original jurisdiction over Mr. Gottlieb and SAF's § 1983 claims under 28 U.S.C. §§ 1331 and 1343 because they arise under the Constitution and laws of the United States, they seek redress for deprivations of federal rights under color of state law, and all other jurisdictional requirements—including standing and ripeness—are met. The district court also had supplemental jurisdiction over Mr. Gottlieb and SAF's state law claims under 28 U.S.C § 1367(a) because they were so related to their federal claims as to form part of the same case or controversy.

8

The district court granted State Defendants' motion to dismiss and entered a final judgment on January 9, 2024. 1-ER-2-19. SAF and Mr. Gottlieb filed a timely notice of appeal on February 8, 2024. 2-ER-313-15. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

## III. CONSTITUTIONAL AND STATUTORY AUTHORITIES

All relevant constitutional and statutory authorities are set out in the Addendum attached to this brief.

## IV. ISSUES PRESENTED

A.  Whether the district court's ruling that Mr. Gottlieb and SAF's claims were not constitutionally ripe was error because Mr. Gottlieb and SAF alleged numerous fully consummated concrete injuries from State Defendants' unconstitutional conduct, including (but not limited to) an actual chill in their political speech and other constitutionally protected activities resulting from the forced diversion of over $100,000 and hundreds of man hours from their advocacy work.

B.  Whether, even if the district court were correct that Mr. Gottlieb and SAF had not alleged sufficiently ripe injuries, it nonetheless erred by (1) failing to grant Mr. Gottlieb and SAF leave to amend so that they could elaborate regarding their fully consummated injuries, and (2) failing to remand the case to state court (as was mandatory) with an award of costs and attorneys' fees to Mr. Gottlieb and SAF for State Defendants' unreasonable removal.

C.     Whether the district court's alternative ruling that Mr. Gottlieb and SAF's claims were not prudentially ripe—a doctrine whose continued validity is highly doubtful[3]—was error because (1) the district court lacked authority to give an advisory opinion on prudential ripeness after concluding it lacked jurisdiction; (2) State Defendants waived prudential ripeness by specifically requesting that a federal court hear the case; and (3) Mr. Gottlieb and SAF properly alleged claims that required no further factual development, and no adequate alternative state law procedure exists through which Mr. Gottlieb and SAF can raise their constitutional claims.

## V.  STATEMENT OF THE CASE

**A.     Factual Background**

**1.     Washington Attorney General Bob Ferguson Uses His Powers of Office against his Ideological Enemies to Advance his Political Career**

Washington Attorney General Bob Ferguson has built his political career on public displays of opposition to conservative politics.[4]  He first gained national attention through his highly publicized legal clashes with the Trump presidential administration.  1-ER-225.  The publicity from these conflicts catapulted Mr. Ferguson to celebrity-like status among his left-of-center political base, and they

---

[3] Mr. Gottlieb and SAF expressly preserve for en banc and Supreme Court review all arguments that prudential ripeness is no longer a valid doctrine and should be abandoned.

[4] For purposes of State Defendants' motion, the district court was required to accept as true these facts taken from Mr. Gottlieb and SAF's Complaint, and to construe them and make all reasonable inferences in the light most favorable to Mr. Gottlieb and SAF.  *Warth v. Seldin*, 422 U.S. 490, 501 (1975).  The same standard applies during this Court's review of the district court's order.  *Id.*

formed a blueprint for the further advancement of his political ambitions.  Since then, Mr. Ferguson's office has consistently involved itself in ideologically charged advocacy and litigation against for-profit businesses and conservative figures and causes.  1-ER-225-26.  And Mr. Ferguson has made political hay of these disputes, often bragging of his record against conservatives and large businesses in press releases and on his campaign website.  1-ER-225-26.

Mr. Ferguson's pursuit of high-profile legal battles with ideological and political overtones has sometimes led to overzealousness.  In many instances, his legal challenges to national policies have been unsuccessful.  1-ER-225.  And Washington state courts have rebuked Mr. Ferguson for utilizing CPD and its CID powers as tools to harass those whose constitutionally protected speech he disagrees with.  1-ER-226-28.  In a recent high profile example, CPD carried out a highly invasive three-year investigation of a for-profit thrift store business called Value Village.  1-ER-227.  Throughout this time, CPD refused to identify what supposedly unlawful conduct it was investigating or to instruct Value Village what practices it should change[5]—a fact one court would later cite as evidence CPD was not actually

---

[5] The one exception was CPD's demand that Value Village register with the Secretary of State as a commercial fundraiser under the Washington Charitable Solicitations Act, notwithstanding the Secretary of State's office itself repeatedly

working to prevent public harm.  1-ER-228.  The investigation culminated in CPD

bringing an enforcement action against Value Village under the Washington

Consumer Protection Act.  1-ER-227.  Although CPD later confirmed in court that

it had no evidence that any consumer had ever been harmed or misled by Value

Village, it nonetheless issued multiple press releases in connection with the lawsuit

falsely claiming that Value Village had deceived Washington consumers about its

for-profit status and lied about the payments it made to charity.  1-ER-228.

Ultimately, the Washington Supreme Court held that CPD's harassment and

prosecution of Value Village violated the First Amendment and was "not supported"

by any proof.  1-ER-227; *see Washington v. TVI, Inc.* ("*Value Village*"), 524 P.3d

622, 627 (Wash. 2023).  On remand, CPD was ordered to pay over $4 million to

Value Village in costs and attorney fees as penalty for its overreach, including for

the multi-year CID-centered harassment campaign that preceded the suit.  Order,

Dkt. 361, *Value Village*, No. 17-2-32886 (King. Cnty. Sup. Ct. Oct. 17, 2023).  In

making the award, the court specifically cited the AGO's "unchastened" and

"dismissive" attitude towards First Amendment rights and its propensity for

---

assuring Value Village that it was not required to register.  1-ER-226.  As related
below, CPD often cites inapplicable registration requirements as a pretext for its
harassment.

needlessly extending litigation through convoluted, ultimately frivolous procedural maneuvers. *Id.* at 18-19. It noted that the AGO had "denigrated" Value Village's constitutional objections throughout the proceeding and unnecessarily run up the cost to the business of defending itself, even "continually request[ing] reconsideration of rulings, despite unanimous opinions rejecting [the AGO's] arguments and holding that [their] actions violated established First Amendment principles." Order at 9, 18; Dkt. 352, *Value Village*, No. 17-2-32886 (King. Cnty. Sup. Ct. Aug. 9, 2023).

Mr. Ferguson remained uncontrite, however, and released a public statement that he was *proud* his office had unconstitutionally chilled Value Village's protected speech through their harassment. 1-ER-227. And, notwithstanding these legal setbacks, Mr. Ferguson's strategy of using his powers of office against those he disagrees with has been politically successful enough that he is now running for Governor. 1-ER-226. His gubernatorial announcement was suitably on-brand, stating "From the Trump Admin & gun lobby to anti-abortion extremists & corporate interests, I've taken on powerful adversaries, and won. That's just the start." 1-ER-226.

13

### 2.    State Defendants Unconstitutionally Target Mr. Gottlieb and SAF in Retaliation for their Protected Advocacy and Political Beliefs

Gun control policy has been one of Mr. Ferguson's primary focuses in office. 1-ER-229.  He has championed a series of state legislative enactments restricting citizens' rights to keep and bear firearms, including a ban on the sale of magazines holding more than ten rounds, a ban on the manufacture or possession of 3D-printed firearms, a ban on the possession of semi-automatic rifles, and measures that would hold gun manufacturers and dealers civilly liable for damages caused by unrelated individuals using their products. 1-ER-229.  Mr. Ferguson publicly threatened legal consequences for local law enforcement officials who questioned the constitutionality of these measures. 1-ER-229.  And he has openly aligned himself with anti-gun rights organizations like CeaseFire, the Alliance for Gun Responsibility, and Grandmothers Against Gun Violence. 1-ER-229-30.  Mr. Ferguson frequently publicly praises these groups, accepts their awards, and speaks at their events. 1-ER-229-30. He even broke from a long tradition of Attorney General neutrality by publicly endorsing their ballot initiatives. 1-ER-229-30.

In sharp contrast, Mr. Ferguson and his office have often clashed with Mr. Gottlieb and SAF, who are long-time advocates for the constitutional rights of citizens to lawfully own and use firearms. 1-ER-230.  Mr. Ferguson and SAF have frequently found themselves on opposite sides of the courtroom as litigants or amici

14

in constitutional challenges to firearm legislation in Washington and across the nation. 1-ER-230-31. And Mr. Ferguson and Mr. Gottlieb routinely criticize each other in press releases, interviews, and other public statements. 1-ER-231-32.

At an unidentified time more than two years ago, the AGO decided that Mr. Gottlieb and SAF had been an obstacle to Mr. Ferguson for long enough. 1-ER-232. Like in *Value Village*, State Defendants had received virtually no consumer complaints regarding SAF or Mr. Gottlieb, and they had no reasonable basis for suspecting SAF or Mr. Gottlieb of unlawful conduct. 1-ER-236-39. CPD nevertheless launched an investigation into SAF and Mr. Gottlieb. 1-ER-232. The investigation was never meant to protect consumers or ensure compliance with the law. 1-ER-238-39. It was retaliation against SAF and Mr. Gottlieb for harboring political beliefs and advocating for causes that Mr. Ferguson disagreed with, and for their public criticism and legal opposition to Mr. Ferguson and his agenda. 1-ER-238-39. State Defendants' purpose was damaging SAF and Mr. Gottlieb's reputation, tying up their resources and manpower, and causing them emotional distress. 1-ER-238-39. State Defendants also hoped the invasive probe would turn up some scandal or evidence of wrongdoing they could use politically, including to justify a public prosecution of the Attorney General's enemies that would generate positive publicity with Mr. Ferguson's base. 1-ER-238-39.

15

State Defendants began by serving CIDs on numerous third-parties with whom SAF and Mr. Gottlieb did business, including everyone from their accountants to their webhosts to the utility company that provides them with electricity. 1-ER-232-33. Each of the CIDs falsely indicated Mr. Gottlieb and SAF were suspected of illegal conduct and demanded the recipient produce large amounts of detailed information regarding the recipient's dealings with them. 1-ER-232-33, 1-ER-244-45. And each included a gag order prohibiting the recipient from notifying SAF or otherwise discussing the CID. 1-ER-232-33.

As State Defendants intended, these CIDs damaged SAF and Mr. Gottlieb's reputations and ability to work with the essential vendors who make their operations possible. 1-ER-233, 1-ER-244-45. As just one example of the disruption State Defendants caused, SAF's accountants completely broke off contact with SAF after receiving a CID and gag order, interrupting an ongoing audit of SAF's finances. 1-ER-232. SAF and Mr. Gottlieb still do not know the full extent of the reputational and operational injuries they have suffered from State Defendants' legal smear campaign, as State Defendants have not disclosed all of the recipients or even the total number of third-party CIDs they have served in connection with the sham investigation. 1-ER-233.

16

On May 5, 2022, State Defendants began serving CIDs directly on Mr. Gottlieb, SAF, and related entities. 1-ER-233. The CIDs contained dozens of interrogatories and requests for extensive document productions, as well as multiple demands that Mr. Gottlieb and others sit for lengthy depositions. 1-ER-233. In some instances, the CIDs explicitly demanded information regarding events that occurred more than *four decades* before, including information that could have been retrieved from the public records of prior court cases that State Defendants were already familiar with. 1-ER-233. Along with the same Consumer Protection and Charitable Solicitations Act violations that CPD cited during its harassing investigation of Value Village, the CIDs strangely claimed State Defendants were looking into possible violations of the Washington Telecommunications Act and Telemarketing Sales Rule. 1-ER-233. SAF does not use automated telemarketing, and State Defendants had no actual basis for believing any of the cited statutes had been violated. 1-ER-234-39. The CIDs were motivated by political animus, not any desire to protect consumers or ensure compliance with the law. 1-ER-238-39.

### 3. Public Records Requests and State Defendants' Own Conduct Reveal the Investigation's Retaliatory Purpose

Upon learning of State Defendants' investigation, Mr. Gottlieb and SAF presumed there had been some misunderstanding and had nothing illicit to hide. ER-1-ER-234. Moreover, they knew of no legal basis for challenging the presumptively

valid CIDs. They therefore complied, retaining counsel to assist them with responding to the CIDs and producing as much of the requested information and documents as they could. 1-ER-234. Much of this information SAF and Mr. Gottlieb were forced to divulge was private, including internal information regarding SAF's donors, operations, and political strategy. Over the following two years, SAF and Mr. Gottlieb were ultimately compelled to spend over $100,000 in legal fees and hundreds of man-hours responding to the CIDs and handling other consequences of the investigation, which was money and labor that would have otherwise gone towards their constitutionally protected political advocacy. 1-ER-234. The considerable stress from the investigation also adversely affected Mr. Gottlieb's health and emotional well-being. 1-ER-244.

Throughout this period, counsel for Mr. Gottlieb and SAF repeatedly inquired about the purpose of the investigation and what type of unlawful conduct Mr. Gottlieb and SAF were suspected of committing so that they could more efficiently clear their names (or, if necessary, bring their operations into compliance with the law). 1-ER-234. State Defendants declined to give a clear answer, and what little they did offer suggested a long series of pretextual, frequently changing legal theories that did not withstand even cursory scrutiny.

18

State Defendants first made oblique references to unlawful auto-dialing, but none of Mr. Gottlieb's organizations have ever used automated dialing technology of any sort. 1-ER-234. At one point, CPD appeared to instead be pursuing a theory that Mr. Gottlieb unjustly enriched himself by leasing his office building in Bellevue, Washington to SAF or in connection with an early 1980s purchase and sale of another Bellevue property. 1-ER-234. But these same claims were rejected by the King County Superior Court decades ago, and the briefest look at prevailing lease rates in Bellevue is enough to demonstrate SAF is dramatically *underpaying* for its space. 1-ER-234. State Defendants then appeared to pursue a similar theory regarding the support services Mr. Gottlieb's company Merril Associates provides to SAF. 1-ER-234. But the rates Merril Associates charges were set and approved by the King County Superior Court long ago in that same proceeding. 1-ER-234. Moreover, all transactions between SAF and any companies in which Mr. Gottlieb has an interest are approved by SAF's board with Mr. Gottlieb abstaining, disclosed in its public tax filings, audited by CPAs with the results posted on SAF's website, and consistently audited a second time by the IRS. 1-ER-234. State Defendants next pivoted to suggesting SAF had misled donors as to how it would use their donations (the same baseless accusation made against Value Village). 1-ER-234-35. But SAF's messaging is explicit and accurate as to how it will use donations,

19

and when pressed, State Defendants were unable to point to a single misleading statement Mr. Gottlieb or SAF had ever made.  1-ER-235.

In search of the State Defendants' real motivation, counsel for SAF and Mr. Gottlieb filed a Washington Public Records Act ("PRA") request in August 2022 seeking all documents reflecting the origins and nature of the investigation and any allegations that had been made against SAF or Mr. Gottlieb.  1-ER-235.  State Defendants still have not fully complied with their PRA obligations, but what they *have* produced demonstrates they never received any consumer complaints suggesting unlawful conduct by SAF or Mr. Gottlieb—a fact State Defendants essentially confirmed in subsequent correspondence.  1-ER-207, 1-ER-235-36.

In January 2023, Mr. Gottlieb sat for the first of several of the depositions State Defendants had demanded of him.  1-ER-236.  Their questioning meandered wildly and was largely unrelated to any of the topics or legal theories State Defendants had previously indicated they were investigating.[6]  1-ER-236.  By the conclusion of the deposition, it finally became clear to SAF and Mr. Gottlieb that they had been wrong to trust in State Defendants' good faith.  *Id.*

---

[6] During the deposition, State Defendants confronted Mr. Gottlieb with a 1999 email between third parties.  1-ER-236-37.  While this email did not indicate any unlawful activity by Mr. Gottlieb, it was plainly responsive to the PRA request, but State Defendants had not produced it.

20

The baseless nature of the investigation was further confirmed when, following the deposition, counsel for SAF and Mr. Gottlieb wrote to State Defendants calling out their unconstitutional retaliatory purpose and demanding that their harassment cease. 1-ER-167-71, 1-ER-237. In response, State Defendants asserted *yet another* brand new, never before mentioned pretextual legal theory. For the first time in the now over-two-year-old investigation, State Defendants claimed they had "significant evidence" that entities associated with SAF and Mr. Gottlieb had not properly registered as commercial fundraisers with the Secretary of State— again, accusations that exactly tracked the unjustified charges they had leveled at Value Village. 1-ER-206-08, 1-ER-237-38; *supra* note 5. SAF and Mr. Gottlieb promptly audited the registration status of each of the CID recipients and wrote back pointing out that every entity either *had* registered and made all required disclosures or was exempt from registration under the relevant statute. 1-ER-173-76, 1-ER-238. They asked State Defendants—who claimed their purpose was "to ensure compliance with the law… nothing more"—to please explain how the law was being violated so SAF and Mr. Gottlieb could bring their conduct into compliance. 1-ER-173-76, 1-ER-238. State Defendants refused because, as with their previous pretextual theories, they had no actual basis for believing entities associated with

21

SAF or Mr. Gottlieb had violated the cited registration laws.  1-ER-238-39.  Instead,

they just pushed to set more depositions.  1-ER-238.  .

**B.    Procedural History**

**1.    State Defendants Attempt to Play Hot Potato with the Case, Bouncing it from Federal Court to State Court to Federal Court to State Court**

By the time SAF and Mr. Gottlieb realized that State Defendants'

investigation had no legitimate basis and was a pretext for politically motivated

harassment, the twenty-day window for challenging their CIDs had long since

closed.  *See* RCW 19.86.110(8).  Having no other options, on May 3, 2023, Mr.

Gottlieb and SAF filed a civil rights suit against State Defendants in the U.S. District

Court for the Western District of Washington seeking an injunction ordering State

Defendants to cease harassing them without any basis for suspecting unlawful

activity and recovery of the damages the State had already caused.  1-ER-239-40, 2-

ER-283-312.  They argued State Defendants' actions violated their constitutional

rights under the First, Fourth, and Fourteenth Amendments, and they brought state

law claims for abuse of process and PRA violations pursuant to the courts'

supplemental jurisdiction.  1-ER-239-40, 2-ER-303-07.

State Defendants moved to dismiss, primarily arguing that the suit could not

be heard by a federal court because the court lacked jurisdiction and was required to

abstain from interfering with state investigatory proceedings out of respect for state

22

sovereignty.  1-ER-239-40, 1-ER-266-71.  These objections were meritless—all jurisdictional requirements were met, and the *Younger* abstention doctrine State Defendants cited specifically does not apply when a plaintiff alleges that state proceedings were instituted in bad faith for the purpose of harassment.  *See Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 435 (1982).  But State Defendant's faux-investigation had already wasted enough of Mr. Gottlieb and SAF's time and resources, and they did not wish to waste even more in collateral litigation over whether the case belonged in state or federal court.  1-ER-240-41.  They voluntarily dismissed their complaint and refiled it in state court where State Defendants had argued it belonged.  1-ER-252-53.

State Defendants still were not satisfied.  They promptly filed a notice of removal, transferring the case right back to the exact same federal court they had only just claimed was not permitted to hear the case.  1-ER-211-14.  And even after that, State Defendants still could not make up their mind.  They immediately filed what was effectively a motion to remand the case once again *back* to the state court they had just removed it from.

Although styled as a motion to dismiss, State Defendants foremost argument was that the federal court whose jurisdiction they had invoked did not have jurisdiction because SAF and Mr. Gottlieb's claims were unripe due to the non-self-

23

executing nature of CIDs.  1-ER-183-84.  State Defendants conceded that, if their arguments were correct, the proper course was remand, not dismissal.  1-ER-77, 1-ER-183-84.  In the alternative, they argued that the federal court they had specifically chosen to hear the case should, out of prudence, decline to hear the case because Mr. Gottlieb and SAF's claims required further factual development and they had adequate state-law procedures for challenging the CIDs.  1-ER-186-89.

In response,[7] SAF and Mr. Gottlieb pointed to the contradiction inherent in State Defendants' actions.  State Defendants' motion failed on the merits because the district court *had* jurisdiction under this Court's precedent, which holds that CID recipients have fully ripe standing to bring a First Amendment claim when they "have suffered injury in the form of objectively reasonable chilling of [their] speech or another legally cognizable harm from the CID *even prior to the CID's enforcement*."  *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1179 n.3 (9th Cir. 2022) (emphasis added).  Moreover, Mr. Gottlieb and SAF's claims were premised on

---

[7] Mr. Gottlieb and SAF requested leave to exceed the word limit in their opposition so that they would have room to fully discuss the implications of State Defendants' procedural moves after providing the detailed factual analysis necessary to respond to the substantive arguments in State Defendants' full-length motion, which raised at least *ten* independent supposed grounds for dismissal.  The district court denied the request.

State Defendants' reasons for *initiating* the sham investigation and *issuing* the CIDs, so they required no further factual development, and State Defendants' own long-held position was that Mr. Gottlieb and SAF do *not* have any right to challenge the CID through state-law channels due to the twenty-day window expiring.[8]  SAF and Mr. Gottlieb thus argued that State Defendants' motion should be denied outright, and they requested leave to amend their Complaint if the district court determined they had not sufficiently spelled out the nature of their fully consummated injuries. 1-ER-139.

On a more basic level, however, State Defendants' arguments that the federal court lacked jurisdiction and should not hear the case were fundamentally incompatible with their removing the case to federal court—a move predicated on the court having jurisdiction and being an appropriate forum to hear the case.  And State Defendants' zig-zagging—where they objected to the initial federal forum and prompted SAF to move the case to state court, but then used removal procedures to move the case back to federal court, but then immediately sought remand *of their own removal* in order to move the case back to state court once more—was a

---

[8] For the first time in reply, State Defendants denied this interpretation of state law, ER-74-75, so Mr. Gottlieb and SAF introduced supplemental evidence demonstrating State Defendants had explicitly argued for such waiver before prior courts and continued to take this position in their private correspondence threatening other CID recipients.  1-ER-25-26, 1-ER-65-67.

25

continuation of the same unconstitutional efforts to drain Mr. Gottlieb and SAF's resources they were being sued for!

Just as State Defendants had sought to waste the time and money of Mr. Ferguson's political opponents through an endlessly meandering investigation that lacked any underlying basis, so too were they trying to waste their time and increase costs in this litigation through highly circuitous, ultimately pointless procedural maneuvers. Indeed, the *Value Village* court had reprimanded State Defendants for doing the exact same thing when ordering them to pay the costs and attorneys' fees they had needlessly run up through similar procedural shenanigans. Order at 9, 18; Dkt. 352, *Value Village*, No. 17-2-32886 (King. Cnty. Sup. Ct. Aug. 9, 2023). Mr. Gottlieb and SAF therefore requested that, if the district court *did* conclude it lacked jurisdiction and remanded, it similarly award them the costs and attorneys' fees they incurred as a result of State Defendants' unreasonable removal.[9] 1-ER-139, 1-ER-142-43; *see also A Forever Recovery, Inc. v. Twp. of Pennfield*, 606 Fed. App'x. 279, 280 (6th Cir. 2015) (upholding fee award when government defendant

---

[9] In reply, State Defendants argued that removal was appropriate because the parties had a "robust, good-faith disagreement" about federal jurisdiction, essentially arguing that they were entitled to an advisory opinion on an issue that would not have been implicated in the state court case. 1-ER-77; *see Polo*, 833 F.3d at 1196 ("State courts are not bound by the constraints of Article III.").

"removed in bad faith to delay litigation because it was aware that the federal claims were unripe at the time of removal").

## 2.   The District Court Dismisses the Case in Violation of Clear Precedent

On January 9, 2024, the district court issued an order granting State Defendants' motion and dismissing the case for lack of jurisdiction. 1-ER-3-19. The district court concluded that State Defendants' removal of the case to federal court did not waive their constitutional or prudential ripeness arguments. 1-ER-16-17. (Mr. Gottlieb and SAF had not argued that removal waived constitutional ripeness.) The court reasoned that subject matter jurisdiction cannot be waived, and the line of cases indicating a state defendant waives prudential ripeness by removing a case is limited to Fifth Amendment Takings claims. 1-ER-16-17. The court further stated that these prudential ripeness waiver cases concerned state law exhaustion, whereas State Defendants' arguments purportedly turned on the facts underlying the claims being "unsettled and incomplete." 1-ER-17.

The district court ruled that SAF and Mr. Gottlieb's claims were not constitutionally ripe because their Complaint "does not allege that Plaintiffs' speech has been chilled." 1-ER-10. The court failed to address SAF and Mr. Gottlieb's argument that, due to SAF's nature as a political advocacy organization, the forced diversion of time and resources *necessarily* chilled their constitutionally protected

27

expression, lowering the amount of advocacy they have and can in the future engage in.[10]  1-ER-144.  The court stated that prior cases in which this Court permitted plaintiffs to bring First Amendment claims based on retaliatory investigations were distinguishable because "the plaintiff there 'would have had no opportunity to challenge any aspect of the investigation until formal charges were brought, at which point they could have faced a large fine.'"  1-ER-11 (quoting *Twitter*, 56 F.4th at 1177 (discussing *White v. Lee*, 227 F.3d 1214, 1241 (9th Cir. 2000))).  The court took State Defendants at their word that, under state law, SAF and Mr. Gottlieb could "raise their First Amendment challenges if the Attorney General moves to enforce the CIDs," without addressing the evidence that, even after this case was filed, State Defendants were still informing CID recipients that they could *not* challenge CIDs outside of the twenty-day window and would have to pay attorney fees if State Defendants moved to enforce.  1-ER-11.

The court similarly discounted the other non-expression related injuries Mr. Gottlieb and SAF had alleged.  It reasoned that the over $100,000 and hundreds of

---

[10] The district court claimed that Mr. Gottlieb and SAF had "effectively concede[d]" that their "speech had not been chilled" merely because they had pointed out that no speech *needs* to be chilled in order for a plaintiff to have standing to bring a First Amendment claim while arguing the other non-speech injuries they had alleged were independently sufficient.  1-ER-11.

man hours they had been forced to expend responding to the CIDs were "voluntary" because "the enforceability of the CIDs remains untested." 1-ER-11-12. The court again failed to acknowledge the evidence that State Defendants consider the CIDs to now be summarily enforceable, nor Mr. Gottlieb and SAF's arguments that any CID enforcement proceeding would *also* require it to expend money and man hours and potentially subject it to penalties, meaning its expenditures were reasonably necessary to prevent other injury.

The court stated that Mr. Gottlieb and SAF's allegations that their reputation had been damaged by the third-party CIDs were "conclusory." 1-ER-12. Although the Complaint was clear that the mechanism and nature of the reputational harm from these CIDs was the false intimation that Mr. Gottlieb and SAF were involved in illegal activity, 1-ER-244, the district court claimed, "There is no allegation of how the CIDs or gag orders caused a reputational harm or what that harm was." 1-ER-11. And though the Complaint had specifically alleged that SAF's operations were disrupted when its accountants abruptly cut contact with the organization in mid-audit after receiving a CID, 1-ER-232, the court stated that "Plaintiffs have not alleged any of the third-parties has actually decided not to work with Plaintiffs." 1-ER-12.

29

The district court then reframed Mr. Gottlieb and SAF's allegations that they had suffered an injury to their privacy by being forced to disclose private information to the *government* to instead be an allegation that they were forced to disclose private information to the *public*. 1-ER-13. It stated, "This skinny argument has no legs" because "[b]y its nature, the CID does not render the information publicly disclosed beyond the AG's office." 1-ER-13.

Finally, the court dismissed the strain that being falsely investigated for illegal conduct has put on Mr. Gottlieb's physical and emotional health, stating "Plaintiffs identify no case law to support the theory that emotional stress or strain on personal health is a cognizable injury in fact in the context of a First Amendment claim." ER-1-ER-13. Notwithstanding its obligation to take the allegations in SAF and Mr. Gottlieb's Complaint as true and draw reasonable inferences in their favor, the court claimed that SAF and Mr. Gottlieb had not provided enough detailed allegations about how the phony investigation had impacted Mr. Gottlieb's health, and it suggested these facts must not be true because "there are no allegations that any alleged emotional or physical harms arising out of the CID process have limited" Mr. Gottlieb from "sparring with Ferguson in the press and in court." 1-ER-13.

The district court accordingly concluded that it lacked jurisdiction over SAF and Mr. Gottlieb's claims. 1-ER-14. The court stated multiple times that the

Complaint required additional allegations and that certain allegations were not sufficiently detailed, but it did not address SAF and Mr. Gottlieb's request for leave to amend in order to provide the details it believed were lacking. And, though State Defendants had *conceded* that remand was the only available remedy for lack of jurisdiction following removal, 1-ER-77, the court instead dismissed the case outright.[11] 1-ER-14. It did not address SAF and Mr. Gottlieb's request for costs and attorney fees for State Defendants' filing a notice of removal that they themselves believed to be frivolous.

Perhaps sensing that its constitutional ruling was untenable, the district court ruled in the alternative that SAF and Mr. Gottlieb's claims were not prudentially ripe because the issues were not yet fit for judicial resolution and withholding consideration would not cause any hardship. 1-ER-14-15. SAF and Mr. Gottlieb had alleged that State Defendants violated their Constitutional rights by *initiating* an investigation and *issuing* CIDs based on political animus and without any basis for suspecting unlawful activity, and they had argued these already-committed violations would not be retroactively repaired if State Defendants were by sheer luck

---

[11] The court separately dismissed SAF and Mr. Gottlieb's state-law PRA claim for lack of supplemental jurisdiction after it had dismissed their federal and state law tort claims based on ripeness. 1-ER-18.

to uncover evidence of actual unlawful activity during their investigation. But the district court ruled that "[a]ny determination of whether the investigation is improper or the CIDS are unenforceable relies on an incomplete factual record" because "the AG's office has yet to conclude the investigation or bring an enforcement action." 1-ER-15. And the court once again cited SAF and Mr. Gottlieb's supposed right to raise their constitutional challenges in an enforcement proceeding in ruling they would suffer no hardship from not being permitted to pursue their claims now (still not addressing the evidence State Defendants do not believe any such right exists). 1-ER-15. The court stated, "It also appears [SAF and Mr. Gottlieb] can bring their claims once the investigation it is complete," 1-ER-15, but it did not explain how SAF and Mr. Gottlieb will know the investigation had reached its conclusion, nor what motivation State Defendants would ever possibly have to declare a phony investigation complete if they know they will face liability when they do so.

## VI.  SUMMARY OF THE ARGUMENT

The district court erred and abused its discretion in numerous ways. Many of its mistakes were tied to the same faulty assumption regarding state law. The court's reasoning repeatedly relied on the premise that Mr. Gottlieb and SAF could raise their constitutional claims if and when State Defendants petition a state court to enforce the CIDs. The court believed Mr. Gottlieb and SAF would not be subject to

any penalties unless and until they refuse to comply after a state court rejects their constitutional objections and enforces the CIDs. But this is not true for multiple reasons.

Notwithstanding their late-breaking, self-serving renunciation, State Defendants themselves have long held that a CID recipient waives all objections (including constitutional objections) to a CID by not challenging it within twenty days of service and will be subject to a cost and attorney fee award for noncompliance if State Defendants then petition a court for enforcement. 1-ER-25-26, 1-ER-65-67. A CID-enforcement proceeding also would not allow Mr. Gottlieb and SAF to challenge the third-party CIDs or to recover damages for past harms. And requiring them to wait to present their federal claims in a state enforcement proceeding imposes the same type of state-exhaustion requirement the Supreme Court has rejected in other contexts because it results in a "preclusion trap" that denies plaintiffs § 1983's guarantee of a federal forum. *Knick v. Twp. Of Scott, Pennsylvania*, 588 U.S. 180, 184 (2019).

In light of this error, the district court's conclusion that SAF and Mr. Gottlieb's allegations failed to establish constitutionally ripe injuries is also clearly wrong. SAF's forced diversion of money and labor from its constitutionally protected advocacy and disclosure of private information was not voluntary because

(at least according to State Defendants) they would have been subject to summary enforcement and penalties if they had not complied with the CIDs. Moreover, SAF and Mr. Gottlieb alleged concrete reputational, operational, emotional, and physical injuries arising from the investigation that are independent of the CID's enforceability or the actions they were compelled to take in response.

But even if the district court *had* been correct that the Complaint's current allegations fell short of establishing federal jurisdiction, it still would have erred by dismissing the case. It is an abuse of discretion to implicitly deny leave to amend without providing reasons, and no reasons that the district court could have provided would justify denying amendment where the district court's reasons for denying jurisdiction were based on the Complaint not expressly alleging particular facts or providing enough detail, which was easily curable. Furthermore, a case simply cannot be dismissed for lack of subject matter jurisdiction after it is removed from state court, only remanded. State Defendants' knew this, and their removal of a case that they themselves believed was beyond the federal court's jurisdiction and must be remanded warrants an award of Mr. Gottlieb and SAF's costs and fees incurred from the pointless maneuver.

The district court's alternative ruling that Mr. Gottlieb and SAF's claims were not prudentially ripe is similarly flawed. First, it was an unauthorized advisory

34

opinion because a court may not weigh in on non-jurisdictional issues after concluding it lacks jurisdiction over a case. State Defendants also waived the issue by removing the case because it is fundamentally inconsistent for them to invoke the federal court's power to hear the case and then ask the court not to hear it out judicial restraint. Further, permitting a defendant to remove a case from a state forum where it might have proceeded to a federal forum where it cannot amounts to improper procedural gamesmanship.

Setting aside that the district court never should have issued an alternative ruling on prudential ripeness, its reasoning is wrong on the merits. Mr. Gottlieb and SAF's claims do not require any further factual development. They turn on the basis and motivations State Defendants had *when they launched the investigation and served the CIDs*, and no future developments can possibly change those past facts. And, as explained, the court's claim that withholding judicial consideration will not cause hardship because Mr. Gottlieb and SAF can effectively bring their claims in a CID enforcement proceeding is incorrect. Its assertion that Mr. Gottlieb and SAF can also bring their claims after the investigation is complete is likewise wrong, and it creates perverse incentives for State Defendants to continue their strategy of harassing their victims indefinitely.

35

## VII.  STANDARD OF REVIEW

This Court reviews a district court's decision to dismiss based on constitutional or prudential ripeness *de novo*.  *Hacienda Valley Mobile Estates v. City of Morgan Hill*, 353 F.3d 651, 654 (9th Cir. 2003).  The same is true for questions regarding the scope of a district court's subject matter jurisdiction and a district court's decision not to remand a case removed from state court.  *Sauk-Suiattle Indian Tribe v. City of Seattle*, 56 F.4th 1179, 1184 (9th Cir. 2022).  This Court reviews denials of both a request for leave to amend and a request for costs and attorneys' fees under § 1447(c) for abuse of discretion.  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000); *Moore v. Permanente Med. Grp., Inc.*, 981 F.2d 443, 447 (9th Cir. 1992).

## VIII.  ARGUMENT

### A.  Mr. Gottlieb and SAF's Claims are Constitutionally Ripe

Courts "appl[y] the requirements of ripeness and standing less stringently in the context of First Amendment claims" and generally "one need not await consummation of threatened injury" before bringing suit.  *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010).  In pre-enforcement actions implicating First Amendment rights, "the inquiry tilts dramatically toward a finding" of ripe injury because of the risks to freedom of expression.  *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000).  The district court nonetheless ruled that Mr. Gottlieb and SAF

36

lacked present standing to challenge State Defendants' unconstitutional retaliatory investigation, primarily relying on this Court's decision in *Twitter, Inc. v. Paxton*, 56 F.4th at 1179.

In *Twitter*, a panel of this Court considered whether the social media company Twitter had standing to bring a First Amendment challenge to a retaliatory Texas CID and investigation. *Id.* at 1172. Texas argued for a categorical rule that a non-self-enforcing CID cannot cause a ripe injury in fact for standing purposes prior to the government petitioning a court for enforcement. *Id.* at 1178-79. This Court rejected that position, confirming that a plaintiff can "suffer[] injury in the form of objectively reasonable chilling of its speech or another legally cognizable harm from the CID even prior to the CID's enforcement." *Id.* at 1178 n.3. The Court however held that Twitter had not sufficiently alleged such harm *in that specific case* because its "naked assertion that its speech ha[d] been chilled [wa]s 'a bare legal conclusion' upon which it [could ]not rely to assert injury-in-fact." *Id.* at 1175. Twitter's past legal fees, diversion of employee time, and production of documents also were not sufficient, the Court stated, because Twitter incurred the costs voluntarily because it could still challenge the CID in a state enforcement proceeding, the produced documents were all already available to the public, and Twitter sought only an injunction against future harm and not damages for past harms. *Id.* at 1175-76.

37

*Twitter* is distinguishable on multiple fronts.

### 1.   Mr. Gottlieb and SAF's Allegations Demonstrate an Actual Chill in First Amendment Activity

First, the district court's claim that Mr. Gottlieb and SAF did "not allege that Plaintiffs' speech has been chilled," 1-ER-10, was incorrect.  The Complaint *did* contain allegations demonstrating Mr. Gottlieb and SAF speech and other First-Amendment-protected activities had been and will continue to be chilled by State Defendants' conduct because, unlike Twitter, SAF and several of the other plaintiffs are non-profit political advocacy groups who exist for the sole purpose of constitutionally protected First Amendment activity.  Money and time are fungible, and any forced diversion of funds and man hours from these organizations' normal operations *necessarily* decreases the amount of First Amendment activity they can engage in.[12]  *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (an advocacy organization can establish an injury supporting standing when it suffered "a diversion of its resources and a frustration of its mission").

---

[12] Again, the district court was required to draw all reasonable inferences in SAF and Mr. Gottlieb's favor.  *Supra*, note 4.

Nor can this diversion of resources be considered voluntary in the same sense as Twitter's expenditures.  In *Twitter*, the Texas Attorney General made public comments indicating his investigation was unconstitutionally retaliatory *before* he served the CID, 56 F.4th at 1172, and thus Twitter had grounds to challenge the CID immediately rather than complying with it.[13]  By contrast, here the retaliatory purpose of State Defendants' investigation was not revealed until years after the CID was served, well after the window to challenge the CID had closed.  Mr. Gottlieb and SAF had no basis for petitioning a court to set aside the CIDs or refusing to comply with them until *after* it expended significant time and resources complying, and they would have likely subjected themselves to sanctions if they had tried.  *See* 1-ER-25 (State Defendants warning another CID recipient they would seek costs and attorneys' fees for noncompliance); *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (standing exists where plaintiff "would have suffered some other injury if it had not diverted resources to counteracting the problem").  And, unlike in *Twitter*, where "enforcement [wa]s no

---

[13] *See also Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 57 (9th Cir. 2024) (applying *Twitter* to find religious university lacked standing to challenge investigation on religious freedom grounds where it had notice in initial letter attorney general was investigating its religious hiring practices under anti-discrimination laws).

rubber stamp" and "[p]re-enforcement, Twitter never faced any penalties for its refusal to comply with the CID," here State Defendants' long-held position is that enforcement *is* a rubber stamp and SAF and Mr. Gottlieb *will* face an attorney fee award and other penalties for refusing to comply because they cannot raise any objections to the CID outside of the twenty-day window.[14]  1-ER-25-26, 1-ER-65-67 (State Defendants' 2017 brief arguing CID recipient waived constitutional objections by not challenging CID within twenty days of service).  At least one Washington trial court has agreed.[15]  *See Washington v. Brelvis Consulting LLC*, 436 P.3d 818, 828 (2019) (noting trial court adopted State Defendants' position that constitutional defenses were procedurally defaulted but affirming on other grounds without reaching question).

### 2.  Mr. Gottlieb and SAF also Alleged Numerous Other Fully Consummated, Constitutionally Cognizable Injuries

"Self-censorship" is also not the only "constitutionally-recognized injury" that can support standing, *Wolfson v. Brammer*, 616 F.3d 1045, 1060 (9th Cir. 2010),

---

[14] The Court should disregard State Defendants' late-breaking about-face on this point given they continue to adhere to their prior position outside of court when privately threatening CID recipients.  *See supra* notes 1 & 8; 1-ER-25-26.

[15] Additionally, as discussed further below in the context of prudential ripeness, forcing SAF and Mr. Gottlieb to wait for a CID enforcement proceeding creates a "preclusion trap" that denies a plaintiff a federal forum for its § 1983 claim, which the Supreme Court has decried in other contexts. *See Knick*, 588 U.S. at 184.

40

and it is not a pre-requisite for a First Amendment retaliation claim, *White v. Lee*, 227 F.3d 1214, 1241 (9th Cir. 2000); *Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226, 239 (E.D.N.Y. 2009) ("Chilling is required to be alleged only in cases where a plaintiff states no harm independent of the chilling of speech."). Unlike in *Twitter*, SAF and Mr. Gottlieb alleged multiple other constitutionally cognizable injuries independent of the chilling of their speech. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (noting "reputational harms, disclosure of private information, and intrusion upon seclusion" are "concrete" injuries that support standing).

In addition to the financial and operational losses they suffered by being forced to respond to first-party CIDs, the defamatory third-party CIDs and gag orders sent to SAF and Mr. Gottlieb's business associates damaged their reputation and further disrupted their operations. 1-ER-232-33, 1-ER-244. The district court called these allegations conclusory, claiming they did not specify how the CIDs damaged their reputation or the nature of the harm, but the Complaint clearly states that CIDs "fals[ly] intimat[ed] that plaintiffs act illegally" and "have violated the law." 1-ER-244. The district court additionally stated "Plaintiffs have not alleged any of the third-parties has actually decided not to work with Plaintiffs," 1-ER-12, but SAF and Mr. Gottlieb specifically alleged that SAF's accountant abruptly broke off contact with the organization mid-audit because of a CID it received. 1-ER-232.

41

The CIDs also forced SAF and Mr. Gottlieb to disclose private documents and other information to the government, and, unlike in *Twitter*, most of the disclosed documents were not "already [] available to the public." 56 F4th at 1176. The district court discounted this harm because "the CID does not render the information publicly disclosed beyond the AG's office," 1-ER-13, but that misses the point. Compelled disclosure *to the government* is an invasion of privacy, particularly when that disclosure reveals private information about a political advocacy organization and its donors and strategy, which in itself risks chilling constitutionally protected associational and expressive rights. *See Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 616 (2021) ("Our cases have said that disclosure requirements can chill association even if there is no disclosure to the general public." (citation and internal alterations and quotes omitted)).

Finally, State Defendants' actions caused Mr. Gottlieb great stress and emotional damage and placed considerable strain on Mr. Gottlieb's health. 1-ER-244. The district court suggested these may not be "cognizable injury in fact in the context of a First Amendment claim," 1-ER-13, but this Court has explicitly held that emotional distress and its health effects *are* sufficient injuries to support standing in a First Amendment retaliation case. *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1319 (9th Cir. 1989). The court also appeared to disbelieve Mr.

42

Gottlieb had suffered these injuries because he did not specifically allege that they have limited his ability to speak publicly or litigate against Mr. Ferguson, 1-ER-13, but, again, the court was required to accept the allegations as true and make all reasonable inferences in Mr. Gottlieb's favor, not against him. *Warth*, 422 U.S. at 501.

In sum, this case is unlike *Twitter* because SAF and Mr. Gottlieb are seeking damages for the many concrete injuries they have *already suffered* from State Defendants' unconstitutional retaliation. The district court erred by concluding their claims are not constitutionally ripe.

**B.    Even if Mr. Gottlieb and SAF had not Provided Sufficient Allegations Regarding their Constitutionally Cognizable Injuries, the District Court would have still Abused its Discretion by Implicitly Denying Leave to Amend**

Even if the district court were correct that Mr. Gottlieb and SAF's Complaint did not sufficiently allege fully consummated injuries in fact, it still would have abused its discretion by dismissing the case rather than granting their request to amend their Complaint. *See* 1-ER-139. As an initial matter, the district court did not expressly address Mr. Gottlieb and SAF's request for leave to amend at all; it just implicitly denied it by dismissing the case. "A simple denial of leave to amend without any explanation by the district court is subject to reversal. Such a judgment is 'not an exercise of discretion; it is merely abuse of that discretion and inconsistent

43

with the spirit of the Federal Rules.'" *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  The court's failure to address the request is therefore in itself a reversible abuse of discretion.

Moreover, Federal Rule of Civil Procedure 15(a)(2) provides that courts "should freely give leave [to amend] when justice so requires."  Under this Court's precedents, "[d]ismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir.1991).  These principles apply with full force to a dismissal based on constitutional ripeness or other similar jurisdictional grounds.  *See, e.g.*, *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1045 (9th Cir. 2015) ("[T]he district judge abused his discretion by dismissing Plaintiffs' complaint for lack of standing without giving Plaintiffs an opportunity to amend.").

In multiple instances, the district court ruled that SAF and Mr. Gottlieb's claims were not ripe because they had not alleged particular facts or to provide enough detail, but there is no indication they *could* not truthfully allege such facts and details upon request if given the opportunity.  The Court claimed that SAF and Mr. Gottlieb had not alleged that their constitutionally protected expression had

actually been chilled, for example. SAF and Mr. Gottlieb disagree their Complaint's existing allegations were insufficient to demonstrate an actual chill, but they were fully capable of providing more details regarding the specific activities they have curtailed as a result of the investigation. *See Media Matters for Am. v. Paxton*, No. 24-CV-147, 2024 WL 1773197, at *16 (D.D.C. Apr. 12, 2024) (distinguishing *Twitter* and finding media organization had present standing to challenge retaliatory CID where organization "demonstrated the profound chilling impact that the CID has had on its news operations and journalistic mission"). The district court also rejected the allegations regarding SAF and Mr. Gottlieb's reputational and operational injuries from the third-party CIDs as "conclusory," and it discounted the Complaint's discussion of Mr. Gottlieb's stress-related injuries as "entirely vague" and lacking "detailed allegations." 1-ER-13. Again, SAF and Mr. Gottlieb could have easily supplemented the already considerable details in their Complaint.

The district court had no basis for believing "the complaint could not be saved by any amendment," *Polich*, 942 F.2d at 1472, and it therefore abused its discretion by implicitly denying SAF and Mr. Gottlieb leave to amend.

45

**C.    If the District Court Lacked Jurisdiction and Properly Denied Leave to Amend, Dismissal *still* was not Permitted, and SAF and Mr. Gottlieb were Entitled to their Costs and Attorneys' Fees**

Even if the district court were correct that SAF and Mr. Gottlieb's allegations did not establish constitutional ripeness and were not obliged to then grant them leave to amend to cure that deficiency, the district court *still* would have erred by dismissing the case because it would have been required to remand it instead.

After a case has been removed from state court, federal law requires that, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case *shall* be remanded." *Polo*, 833 F.3d at 1196 (emphasis in original) (quoting 28 U.S.C. § 1447(c)). "Section 1447(c) is mandatory, not discretionary." *Bruns v. Nat'l Credit Union Admin.*, 122 F.3d 1251, 1257 (9th Cir. 1997). Thus, "a removed case in which the plaintiff lacks Article III standing *must* be remanded to state court under § 1447(c)" because "a failure of federal subject-matter jurisdiction means only that the *federal* courts have no power to adjudicate the matter[;] State courts are not bound by the constraints of Article III." *Polo*, 833 F.3d at 1196 (emphasis added). State Defendants thus conceded before the district court that their contentions that Mr. Gottlieb and SAF's claims were not constitutionally ripe were arguments for remand, not dismissal. 1-ER-77 ("SAF is

46

correct that remand is appropriate if SAF's claims are constitutionally unripe.").  The district court nevertheless dismissed the case.

"The process of removing a case to federal court and then having it remanded back to state court delays resolution of the case, imposes additional costs on both parties, and wastes judicial resources."  *See Martin v. Franklin Capital Corp.*, 546 U.S. 132, 140 (2005).  Congress therefore included a provision in § 1447(c) allowing the court to award "payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."  Courts should "award attorney's fees under § 1447(c)... where the removing party lacked an objectively reasonable basis for seeking removal" or other unusual circumstances justify an award.  *Martin*, 546 U.S. at 141.  "[B]ad faith is not necessary for an award of attorney's fees[.]"  *Moore v. Permanente Med. Grp., Inc.*, 981 F.2d 443, 446 (9th Cir. 1992).

"An action filed in state court may be removed only if the district court could have exercised jurisdiction over the action if originally filed there."  *Duncan v. Stuetzle*, 76 F.3d 1480, 1485 (9th Cir. 1996) (citing *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987)).  A federal court cannot have subject matter jurisdiction unless a case is constitutionally ripe.  *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir. 2005).  Therefore, the necessary implication of State Defendants arguments that SAF and Mr. Gottlieb's claims were not constitutionally ripe is that

47

State Defendants filed a notice of removal they themselves believed was a frivolous waste of time and resources. *Contra* Fed. R. Civ. P. 11(b).

State Defendants' removing the case and then immediately arguing for remand is precisely the type on unreasonable procedural move § 1447(c)'s fee shifting provision was intended to deter. Indeed, the Sixth Circuit recognized as much when upholding a § 1447(c) award under strikingly similar circumstances. *See A Forever Recovery, Inc. v. Twp. of Pennfield*, 606 Fed. Appx. 279, 279 (6th Cir. 2015). Just like here, a plaintiff sued a government defendant in state court for federal constitutional violations, and just like here, the government defendant "removed to federal court on the basis of federal-question jurisdiction and, six days later, filed a motion to dismiss on the ground that the federal questions raised were unripe." *Id.* The district court agreed, remanded, and awarded the plaintiff its costs and attorney fees because the defendant "knowingly removed on the basis of unripe claims that it did not believe the district court should hear." *Id.* at 283. The Sixth Circuit affirmed, holding that "[t]he six-day turnaround between removal and [the] motion to dismiss raises suspicion that [the defendant] was aware that the federal claims were unripe and lacked a good-faith belief that the district court should have heard the claims when it removed." *Id.* at 284. The court held that such a knowingly frivolous maneuver amounts to a "[b]ad-faith motivation to remove for the purpose

48

of prolonging litigation and imposing costs on the opposing party," which "indisputably qualifies as an 'unusual circumstance' that would justify the award of fees under § 1447(c), even if the defendant had an objectively reasonable basis for removal." *Id.*

The same is true here. State Defendants cannot credibly deny they "knowingly removed on the basis" of what they regarded as "unripe claims that [they] did not believe the district court should hear." *Id.* at 283. They not only immediately filed a new motion to dismiss arguing just that, but they also raised the exact same arguments in their prior motion to dismiss the first federal case. 1-ER-261-64. Although there is no requirement to show bad faith, this effort to delay litigation and run up costs is a continuation of the same strategy State Defendants employed against SAF and Mr. Gottlieb in their sham investigation, and it mirrors the litigation tactics that earned them a costly rebuke in *Value Village*. If the district court lacked jurisdiction, SAF and Mr. Gottlieb were entitled to their costs and attorneys' fees, and the district court abused its discretion by not awarding them.

## D. The District Court's Alternative Ruling Regarding Prudential Ripeness was Erroneous for Multiple Reasons

Prudential ripeness is not jurisdictional, but instead a doctrine under which a federal court can decline to hear a case when "problems of prematurity and abstractness… present 'insuperable obstacles' to the exercise of the Court's

49

jurisdiction, even though that jurisdiction is technically present."[16] *In re Coleman*, 560 F.3d 1000, 1006 (9th Cir. 2009) (alterations omitted) (quoting *Socialist Labor Party v. Gilligan*,13 406 U.S. 583, 588 (1972)).   The district court's alternative ruling that SAF and Mr. Gottlieb's claims were not prudentially ripe was wrong on the merits, but this Court need not reach that issue because the alternative ruling was an unauthorized advisory opinion and State Defendants waived prudential ripeness in any event.

### 1.    Federal Courts are Not Allowed to Provide Advisory Rulings on Other Issues after Concluding They Lack Jurisdiction

"Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing [or here, remanding] the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514, 19 L.Ed. 264 (1868)).   Consequently, when a court concludes it lacks jurisdiction, it has no power to issue an alternative ruling based on non-jurisdictional grounds. *Righthaven LLC v. Hoehn*, 716 F.3d 1166,

---

[16] The Supreme Court has strongly intimated that prudential ripeness is no longer a valid doctrine, as it conflicts with "the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (internal quotes and citation omitted).

1172 (9th Cir. 2013). "Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning." *Steel Co.*, 523 U.S. at 101.

"Prudential ripeness is properly analyzed under Rule 12(b)(6) rather than Rule 12(b)(1) because it does not implicate subject matter jurisdiction." *N. Mill St., LLC v. City of Aspen*, 6 F.4th 1216, 1230 (10th Cir. 2021); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014) (explaining other "prudential standing" doctrines in reality address whether plaintiff has a cause of action). And "[a] motion to dismiss for failure to state a claim may be decided only after finding jurisdiction over the subject matter, because to rule on the validity of a claim is, in itself, an exercise of jurisdiction." Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1350 (4th ed.) (citing *Bell v. Hood*, 327 U.S. 678 (1946)); *accord, e.g., Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) ("[T]he court should dismiss only on the jurisdictional ground under Fed.R.Civ.P. 12(b)(1), without reaching the question of failure to state a claim under Fed.R.Civ.P. 12(b)(6)."). The district court therefore was without authority to issue alternative rulings that SAF and Mr. Gottlieb's claims were separately constitutionally unripe and prudentially unripe—once it ruled it lacked jurisdiction, it surrendered its ability to rule on non-jurisdictional issues.

51

## 2.    State Defendants Waived Prudential Ripeness by Removing the Case

If the district court were authorized to provide a ruling on prudential ripeness, it erred in ruling State Defendants had not waived the issue by removing the case. Because prudential ripeness is not jurisdictional, it may be waived or forfeited. *See, e.g.*, *Patel v. City of S. El Monte*, 827 Fed. App'x. 669, 672 (9th Cir. 2020) (citing *City of Oakland v. Lynch*, 798 F.3d 1159, 1163 n.1 (9th Cir. 2015)).

Multiple courts have recognized that removal waives a state defendant's objections to prudential ripeness because it is inconsistent for a state official to "invoke federal jurisdiction," "thereby contending that the 'Judicial power of the United States' extends to the case at hand,'" then tell the federal court it must decline to hear the case. *River N. Properties, LLC v. City & Cnty. of Denver*, No. 13-CV-01410-CMA-CBS, 2014 WL 1247813, at *3 (D. Colo. Mar. 26, 2014) ("[R]emoval is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation… in a federal forum." (quoting *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 619 (2002))); *accord, e.g.*, *Sansotta v. Town of Nags Head*, 724 F.3d 533, 546-47 (4th Cir. 2013); *Westland Irrigation Dist.*, No. 2:16-CV-1318-SI, 2017 WL 1055960, at *3 (D. Or. Mar. 20, 2017). The rationale for the rule is straight forward—it is improper "procedural gamesmanship" for a defendant to "manipulat[e] litigation" by asking a

52

federal court to decline to hear a case that the defendant removed from a state court that might have heard the plaintiffs' claims, "thereby denying a plaintiff any forum for having his claim heard." *Sansotta*, 724 F.3d at 546-47.

The district court reasoned that these cases were not applicable because they all specifically concerned *Williamson County*'s now-defunct prudential ripeness rule that a plaintiff must exhaust all state law procedures for obtaining just compensation before bringing a § 1983 Takings claim. 1-ER-17 (citing *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 194 (1985), overruled by *Knick*, 588 U.S. at 180). The court believed the principle that removal waives prudential ripeness objections does not "appl[y] outside of the Taking Clause" and stated these cases do not "st[and] for the general principle that a defendant waives state law exhaustion requirements by removing an action." 1-ER-17. The district court also reasoned the crux of State Defendants' prudential ripeness contention was that "the factual record on which the claims turn is unsettled and incomplete" due to the investigation being unfinished, so cases about waiver of state exhaustion requirements were not relevant. 1-ER-17.

The district court misunderstood SAF and Mr. Gottlieb's argument. The *Williamson County* rule was overruled because applying prudential ripeness in that context effectively imposed a state law exhaustion requirement that denied plaintiffs

a federal forum for presenting their § 1983 claims.  *Knick*, 588 U.S. at 185 (explaining that the "preclusion trap" that resulted from requiring a plaintiff to exhaust state law remedies in order for a claim to be prudentially ripe was contrary to "the settled rule [] that exhaustion of state remedies is not a prerequisite to an action under 42 U.S.C. § 1983.").  SAF and Mr. Gottlieb thus do not need to establish that "a defendant waives state law exhaustion requirements by removing an action" because there *are no* state law exhaustion requirements for their claims.

Nor is the fact that State Defendants (incorrectly) claim that the factual record on which the claim turns is unsettled relevant to why removal should waive their prudential ripeness objections.  Prudential ripeness is a doctrine employed by *federal* courts, and there is no guarantee a state court from which a defendant removes a case will apply something similar.[17]  Allowing a defendant to transfer a case from a forum where it might be heard to a forum where it cannot be heard and then move for dismissal is the type of "procedural gamesmanship" that courts refuse to endorse,

---

[17] Before the district court, State Defendants argued that Washington state courts also occasionally employ a ripeness test that is similar to the federal prudential ripeness standard.  ER-76.  But whether Washington courts *specifically* have sometimes employed a *similar* analysis is neither here nor there.  The point is that state courts are not obligated to apply the same prudential ripeness test as federal courts, and whether removal inherently waives objections to a federal court hearing the case should not vary across the country depending on local state court practices.

*Sansotta*, 724 F.3d at 546-47, regardless of whether a case involves a Takings violation or some other claim for relief.

### 3.    Mr. Gottlieb and SAF's Claims are Prudentially Ripe

Finally, the district court's ruling that Mr. Gottlieb and SAF's claims are not prudentially ripe is just wrong on the merits.  The prudential ripeness inquiry asks whether "further factual development would significantly advance [a court's] ability to deal with the legal issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 737 (1998).  Courts consider two factors in determining whether a case satisfies prudential requirements for ripeness: (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1211 (9th Cir. 2006) (en banc).  Whether a dispute is fit for judicial consideration depends on the "state of the factual record" and the "substantive legal question to be decided." *Id.* at 1206.

The district court stated *ipse dixit* that "[a]ny determination of whether the investigation is improper or the CIDS are unenforceable relies on an incomplete factual record." 1-ER-15.  It does not.  All of SAF and Mr. Gottlieb's claims turn on acts that have already occurred—the basis and purpose State Defendants had back when they *initiated* the investigation and *issued* the CIDs (as well as their

motivations for any subsequent discrete investigatory actions that caused additional harm). *See Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858, 869 (9th Cir. 2016). The launch of the investigation and the issuance of the CIDs are past, fully consummated actions, and State Defendants' original purpose for taking those actions cannot be affected by future events. Even if State Defendants were to through sheer luck uncover some evidence of unlawful activity in 2024 or beyond, it would not retroactively cure their unconstitutional acts in 2021 through 2023; State Defendants cannot alter their past motivations. If they launched the investigation and served the CIDs for retaliatory purposes and without any reasonable basis for suspecting unlawful activity, they violated the Constitution, and no new facts that could possibly arise in the future will have any effect on that determination. This case accordingly presents the kind of "concrete factual situation" that is *currently* ripe for adjudication. *Alaska Right to Life PAC v. Feldman*, 504 F.3d 840, 849 (9th Cir. 2007).

The district court also stated that SAF and Mr. Gottlieb would not suffer any harm from withholding judicial consideration because they can raise their claims in a CID enforcement proceeding. Once again, State Defendants' own position is that SAF and Mr. Gottlieb *cannot* raise their claims in a CID enforcement proceeding. Even if they could, such a proceeding does not offer any avenue for challenging the

third-party CIDs or obtaining a damage award to redress the harm SAF and Mr. Gottlieb have already suffered.

Moreover, prohibiting SAF and Mr. Gottlieb from raising their claims prior to such an enforcement proceeding presents the same kind of "preclusion trap" the Supreme Court decried in *Knick*, 588 U.S. at 184-85. Section 1983 "guarantees 'a federal forum for claims of unconstitutional treatment at the hands of state officials.'" *Id.* (quoting *Heck v. Humphrey*, 512 U.S. 477, 480 (1994)). But using "prudential ripeness" to require the recipient of an unconstitutional CID to first raise his claims in a state enforcement proceeding denies him that guaranteed federal forum through a "Catch-22." *Id.* A state court's resolution of an issue "generally has preclusive effect in any subsequent federal suit" under res judicata principles. *Id.* A plaintiff bringing a § 1983 claim based on a CID thus "cannot go to federal court without going to state court first; but if he goes to state court and loses, his claim will be barred in federal court. The federal claim dies aborning." *Id.* Section 1983's "guarantee of a federal forum rings hollow for [such] plaintiffs, who are forced to litigate their claims in state court." *Id.*

The district court also suggested that SAF and Mr. Gottlieb could bring their claims once the investigation is finished. But the alleged facts of this case are that State Defendants intend to harass and drain SAF and Mr. Gottlieb's resources by

57

drawing out the investigation indefinitely, without any need for State Defendants to ever conclude it by declaring SAF and Mr. Gottlieb innocent or bringing a lawsuit where they would be required to put on actual proof. Even if continuing the investigation perpetually were not already part of their plan, State Defendants would have little reason to publicly declare the investigation complete if their doing so would finally clear the way for them to face accountability.[18] If the district court's reasoning were correct, State Defendants could perpetually harass a target, never bringing charges or closing the investigation, and the target would be without recourse no matter how blatantly obvious their unconstitutional motive. Clearly, that is not the law. *See, e.g.*, *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) (retaliatory investigation violates the target's First Amendment rights).

## IX. CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order dismissing the case.

---

[18] The claims would also likely be barred by statutes of limitation by this point, because, again, they are primarily based on State Defendants' conduct when launching the investigation and serving the CIDs. *See Wallace v. Kato*, 549 U.S. 384, 388 (2007).

DATE: July 22, 2024

CORR CRONIN LLP

*s/ Jack M. Lovejoy*
Steven W. Fogg, WSBA No. 23528
Jack M. Lovejoy, WSBA No. 36962
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
(206) 625-8600 Phone
(206) 625-0900 Fax
sfogg@corrcronin.com
jlovejoy@corrcronin.com

*Attorneys for Plaintiffs/Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  | 24-760

I am the attorney or self-represented party.

**This brief contains** | 13,274 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Jack M. Lovejoy | **Date** | 07/22/24

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                              *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on the date provided at the signature below, I electronically filed the preceding document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties/counsel of record.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, to the best of my knowledge.

Dated this 22nd day of July, 2024 at Seattle, Washington.

By:

_s/ Wen L. Cruz_
Wen L. Cruz